## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| **SACHIN SUNDAR,** <br> c/o WHITTAKER LAW, LLC <br> 2055 Reading Road, Suite 260 <br> Cincinnati, Ohio 45202 <br><br> **Plaintiff,** <br><br> **v.** <br><br> **UNIVERSITY OF KENTUCKY,** <br> Office of Legal Counsel <br> 301 Main Building <br> Lexington, KY 40506-0032 <br><br> and <br><br> **BLUEGRASS** <br> **ADVANCED MATERIALS, LLC,** <br> c/o its Registered Agent: <br> S&H Lexington, LLC <br> 250 West Main Street, Suite 2300 <br> Lexington, Kentucky 40507 <br><br> **and** <br><br> **TRISHA CLEMENT, Ed.D.,** <br> **personally and in her capacity as** <br> **a public official acting under** <br> **color of state law,** <br><br> **and** <br><br> **JULIA F. COSTICH, PhD.,** <br> **personally and in her capacity as** <br> **a public official acting under** <br> **color of state law,** <br><br> **and** <br><br> **J. ZACH HILT, Ph.D., personally** <br> **and in his capacity as a public** <br> **official acting under color of state** <br> **law,** <br><br> **and** | **Case No.: _____** <br><br> **Judge: _____** <br><br> **COMPLAINT AND JURY DEMAND** |

**MOLLY REYNOLDS, Ph.D.,** )
**personally and in her capacity as** )
**a public official acting under** )
**color of state law,** )
                                )
        **Defendants.** )
                                )

**COMES NOW**, Plaintiff Sachin Sundar, by and through counsel and for his

Complaint and Jury Demand against Defendants the University of Kentucky and

Bluegrass Advanced Materials, LLC, and Trisha Clement, Ed.D., Julia F. Costich, Ph.D.,

J. Zach Hilt, Ph.D., and Molly Reynolds, Ph.D., individually in and their capacities as a

public officials acting under color of state law, states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff realleges and incorporates the preceding paragraphs of this

Complaint as if fully rewritten.

2.      Plaintiff Sachin Sundar currently resides in Honolulu County, Hawaii. At

all times relevant to the Complaint, however, Plaintiff resided in Fayette County,

Kentucky.

3.      At all times relevant to this Complaint, Defendant the University of

Kentucky ("UK" or "the University"), has been a public research university with 500 or

more employees, and a recipient of federal funding located in Fayette County.

4.      At all times relevant to this Complaint, Defendant Bluegrass Advanced

Materials, LLC ("BAM") has been a limited liability company organized under the laws

of the Commonwealth of Kentucky, principally located on the University of Kentucky Campus in Fayette County, Kentucky.[1]

5.      At all times relevant to this Complaint, Defendant Trisha Clement, Ed.D., has been UK's Associate Vice President and Dean of Students, and a resident of Fayette County, Kentucky.

6.      At all times relevant to this Complaint, Defendant Julia F. Costich, Ph.D., has been the Interim Chair and Chair of UK's Department of Health Management & Policy.  Between 2004 and the present, Dr. Costich has also served as the Program Director for the master's program in Health Administration, and the Interim Chair of the Department of Health, Behavior & Society, and resident of Fayette County, Kentucky.

7.      At all times relevant to this Complaint, Defendant J. Zach Hilt, Ph.D., has served as a Professor of Chemical Engineering, the Director of Graduate Studies for the chemical engineering program, and has been a resident of Fayette County, Kentucky. Upon information and belief, Hilt is also one of the principal partners, officers, founders, members, and/or owners of BAM.

8.      At all times relevant to this Complaint, Defendant Molly Reynolds, Ph.D., has served as UK's Associate Vice President for Student Excellence.[2]

---

[1]      UK and BAM may be collectively referred to in this Complaint as "the Employer Defendants" or "the Employers," unless otherwise indicated.

[2]      Clement, Costich, and Hilt, Reynolds may be collective referred to in this Complaint as "the Individual Defendants" or "the Individuals," unless otherwise indicated.

9.     This Court has personal jurisdiction over the parties to this Civil Action and subject matter jurisdiction over the claims alleged under 28 U.S.C. §1331, based on the federal questions presented.

10.     Venue is appropriate in this Court because Defendants are principally located in this federal district.

## FACTS

11.     Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

12.     On or about April 18, 2022, UK extended Plaintiff an offer to join its MD/PhD Program at the College of Medicine ("COM") beginning in the fall 2022 - 2023 academic year.  [**Exhibit 1**].  With that, UK offered Plaintiff a scholarship that guarantees the cost of medical school tuition and student fees, and a $25,000 annual stipend for four years.

## 2023

13.     Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

14.    On **June 1, 2023**, Plaintiff's mental health counselor employed by UK wrote as follows to Dr. Sidney Whiteheart:



Counseling Center
Consultation and Psychological Services

800 Rose Street, MN-103
635 S. Limestone St., 104
Mandrell Hall
Lexington, KY 40508-0651
Phone (859) 257-8701
Fax (859) 257-3319



2023 June 1

Dr. Sidney Whiteheart
BBSRB 361
741 South Limestone
University of Kentucky

Dear Dr. Whiteheart,

Please note this letter is written to you with the express written consent of Mr. Sundar (ID# 912645985), should be treated as confidential, and shared only on a strict need-to-know basis. Mr. Sundar came to the University of Kentucky Counseling Center – College of Medicine office – this year to discuss difficulties he has faced throughout his life. He has sought treatment from our office for help in dealing with his stressors. He was given preliminary diagnoses at UKCC COM that support Mr. Sundar's request to be excused from a retreat this coming weekend. Being in the environment of this retreat and away from his supports at the close of this first year of medical school is ill-advised. Mr. Sundar has plans to continue counseling here over the summer so that he will be better prepared to tackle his academic load in the fall and beyond. I do want to note that I will not be in this position past this month, so Mr. Sundar's continued therapy will not be with the undersigned.

Please feel free to contact me if I can be of further assistance.

Jamie Lynn Hopkins, Ph.D.
She/ her/ hers
Staff Psychologist, Licensed, HSPP
University of Kentucky Counseling Center
*Consultation and Psychological Services*
UK College of Medicine
800 Rose Street, MN-103
Lexington, KY 40536-0298
859-257-8701

15.     On **August 22, 2023**, Stephanie L. White, MD, Senior Associate Dean for

Medical Student Education and Associate Professor of Pediatrics, wrote as follows to

Plaintiff:

> Sachin,
> I wanted to recap our meeting yesterday and discuss the next steps for how the MD/PHD program will continue to support you and other students.
>
> - We are finalizing plans to cover Student Health Insurance and expect announcements in the next couple of weeks.
> - The program is updating departmental faculty/staff with MD/PHD program guidelines so students can receive appropriate support during their Ph.D. time.
> - Class meetings will be scheduled to provide program updates and solicit feedback. Look out for this session.
> - We will explore using an incident report and feedback button on the MD/PHD website to mirror processes in place for the MD program and biomedical education.
>
> Finally, we explored the possibility of adding summer living expenses to qualify you for additional loans. Unfortunately, the two additional months of living expenses still do not bring your unmet needs to a positive number. As such, based on Department of Education rules, we cannot allocate additional loans. I know you have worked through this before with Raymond, but I wanted you to know that we reviewed it in the context of adding additional summer living expenses.
>
> Please let me know if you have additional questions.
> S. White

16.    On or about September 26, 2023, Plaintiff's psychiatrist authored the following accommodation request on Plaintiff's behalf:



UNIVERSITY HEALTH SERVICE BEHAVIORAL HEALTH
830 S LIMESTONE
LEXINGTON KY 40505-3552
859-323-5511

September 26, 2023

To Whom It May Concern:

I am writing this letter on behalf of Sachin Sundar (DOB 4/14/1997) whom I have seen at the University Health Service Behavioral Health Clinic for diagnoses of anxiety, mood disorder unspecified and PTSD.

I believe that he could benefit from some accommodations, including but not limited to: extended test time, testing in a low-distraction or distraction-free environment and assignment deadline flexibility for his mental health.

Thank you for your time and consideration.

Sincerely,


Cole Carlblom, DO
PGY-3
UK Department of Psychiatry
University Health Services Behavioral Health
830 South Limestone St
Lexington, KY 40536-0582

17.    On October 15, 2023, Plaintiff met with Disability Accommodation Consultant, Catherine Troop, Ph.D., LPC, LCADC, in the Disability Resource Center ("DRC").  During that meeting, Dr. Troop questioned whether Plaintiff had a disability at all, told Plaintiff that it would be unfair to other students if he were to receive accommodations for his disabilities, and that it was difficult to get accommodations from

the medical school.    Dr. Troop also required Plaintiff to explain the details of his conditions.

18.    On October 16, 2023, however, Troop, issued a notice to Plaintiff's instructors, and COM officials informing them that Plaintiff had requested and had been granted the following disability accommodations for the 2023-2024 academic year: (a) Plaintiff would be allowed to reschedule exams due to the exacerbation of symptoms related to anxiety, panic disorder, and PTSD; (b) Plaintiff would be allowed flexibility with due dates, to be negotiated between Faculty and Plaintiff's Disability Consultant; and (c) Plaintiff would be allowed flexibility with attendance policies.

19.    One of Plaintiff's professors, Sidney W. Whiteheart, Ph.D., balked, however, and told Plaintiff that he didn't need additional time to complete an assignment, and accused Plaintiff of making "threats" where there objectively were none, for engaging in protected activity, advocating for his rights under federal and state law, and UK's administrative regulations and policies, and objecting to being treated less favorably than other students because of his disabilities.    When Plaintiff objected to his treatment generally, and for requesting and receiving accommodations, specifically, he was met with hostility from UK officials like Professor Whiteheart and accused of making "threats."

20.    Similarly, MD/PhD Program Administrator/Director, Therese Sterns, remarked that mental health days are for lazy people.

21.    On or about November 8, 2023, Plaintiff informed officials in the College of Medicine that the symptoms associated with his disabilities were being exacerbated by the hostility he was receiving and requested an accommodation to reschedule a

presentation for the following month, which Professor Whiteheart denied on November 9, 2023, by parsing the scope of the accommodations granted to him.

22.     Later that day, Plaintiff's spouse objected to UK's treatment of him to the Director for Campus Accessibility and ADA Coordinator, Heather Roop.

23.     At 3:47 pm on November 15, 2023, Roop informed Plaintiff that his request for an extension of his presentation that evening at 5:30 was approved.

24.     On or about November 16, 2023, Plaintiff requested a second medical leave of absence because the accommodations previously granted to him weren't being honored.  In response, UK officials informed him that he could lose his stipend and be required to pay back a portion of his scholarship.

25.     On November 21, 2023, Plaintiff met with UK officials to discuss the scope and terms of a second medical leave of absence and was informed immediately that he would be required to repay $65,000.00 of his scholarship if he did so, and that he would be paid nothing the following semester.  Nevertheless, later that evening, Plaintiff formally requested a second leave of absence.

26.    On or about November 28, 2023, Plaintiff supplied the following documentation from his mental health counselor:



November 28th, 2023

Earl Johnson, Marriage and Family Therapist Associate
The Trauma-Informed Counseling Center
80 Codell Dr UNIT 230, Lexington, KY 40509

To Whom It May Concern:

I hope this letter finds you well. I am writing to formally request medical leave for my client, Sachin Sundar, who has been under my care since August 31, 2023, and is enrolled in the MD/PhD program.

Sachin suffers from an ADA-protected medical condition and has undergone intensive outpatient treatment due to the stress and anxiety from various issues including what he perceives as unprofessionalism within the program's administration and beyond. This stress has notably worsened his condition-related symptoms.

I kindly request your understanding and support in granting Sachin medical leave to prioritize his treatment and distance himself from the negative environment affecting his well-being. Additionally, I urge measures to be taken to create a safer and more supportive program environment for Sachin, as this is crucial for his success given his medical condition.

I believe that with the right accommodations and your support, Sachin can overcome these challenges and continue to excel in the program. Your prompt attention to this matter is greatly appreciated.

Thank you for your understanding.

Sincerely,

*Earl Johnson*

Earl Johnson, Marriage and Family Therapist Associate

27.    On November 29, 2023, the College of Medicine granted Plaintiff's application for a second medical leave of absence through the end of the fall semester.

28.     In a December 18, 2023, Letter, Associate Dean of Students Hannah noted that Plaintiff had been offered employment in the research lab run by Dr. Hilt.  Simms also noted that Plaintiff "had shared with a few individuals that [he had] experienced discrimination, harassment and retaliation" during his time in the MD/PhD program, and those concerns had been forwarded to the Office of Institutional Equity ("OOIE").  Simms reiterated that OOIE "is responsible for upholding the University's commitment to equal opportunity for all members of the University's community in academic programs, research, service, and employment."

## 2024

29.     Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

30.     On August 22, 2024, the Office of Institutional Equity and Equal Opportunity electronically delivered the investigation results to Plaintiff to his allegations of discrimination against Dr. Whiteheart and Therese Stearns.

31.     On September 11, 2024, Plaintiff asked Jennifer Fransen why all OEO issues had not been addressed.

32.     On October 7, 2024, Plaintiff complained to Thomas Dziubla about Dr. Hilt.

33.     On October 8, 2024, Plaintiff raised complaints to Dr. Hilt regarding ADA accommodations and the lab environment.

34.     On October 10, 2024, Plaintiff forwarded an email thread to Dr. Turkington concerning complaints to Dr. Hilt about being called "slow."

35.     In retaliation, Dr. Hilt expelled Plaintiff from Hilt's research group and left without an academic advisor.

36.     On October 16, 2024, Plaintiff was invited to schedule an appointment with a psychiatrist.

37.     On October 18, 2024, Plaintiff's healthcare provider, employed by UK, diagnosed Plaintiff with PTSD and Chronic Major Depressive Disorder, and concluded that Plaintiff could benefit from partial hospitalization, and advocated for accommodations from the university to address Plaintiff's overall mental health concerns.

38.     On October 21, 2024, Plaintiff objected to discrimination and retaliation by Dr. Hilt and submitted logs of evidence supporting the conclusions of the same.

39.     On October 22, 2024, UK informed Plaintiff that if he took a medical leave of absence, he would be expelled from the program and terminated from his employment, to which Plaintiff objected as discriminatory.  Professor Dziubla then reminded Plaintiff that UK had already granted him one accommodation earlier in the semester.

40.     October 23, 2024: Plaintiff's mental health counselor submitted a medical leave request for Plaintiff, and Plaintiff requested an accommodation in the form of medical leave.

41.     On October 24, 2024, Dr. Sawaya informed Plaintiff that a $50,000 grant was revoked, and Plaintiff filed a complaint of discrimination with UK's Office of Equal Opportunity.

42.     In retaliation, and before the Office of Equal Opportunity had the opportunity to investigate Plaintiff's complaint, on October 25, 2024, Defendants put

Plaintiff in "involuntary medical withdrawal" ("IMW") status from his coursework for the balance of the Fall 2024 semester without notice and without any opportunity to be heard, because Plaintiff voluntarily confided to a faculty member that he was having suicidal thoughts and struggling overall with his mental health.

43.     IMW procedure is governed by UK Administrative Regulation ("UKAR") 4:12.  UK's Administrative Regulations are policies adopted by the President of the University to implement "Governing Regulations" and "provide for the general administration and oversight of the University."  The "Governing Regulations" are policies adopted by the Board of Trustees for the governance and operations of the University.

> These regulations provide the framework for the University administration to comply with federal and state law and implement Board decisions. Through the Governing Regulations, the Board of Trustees mandates and delegates the necessary authority to various individuals and constituencies to fulfill the University's missions.

44.     By its terms, UKAR 4:12 applies to all UK students:

> For purposes of this regulation, "student" means any person who is enrolled at the University and who has not completed a program of study in which he or she is enrolled.  Student status continues whether or not the University's academic programs are in session.  Student status applies to those taking courses for credit or non-credit at the University, either full-time or part-time, while pursuing undergraduate, graduate, or professional studies.  Persons who are living in University housing, although not enrolled at the University, are also considered students.

45.     According to Section III.A of UKAR 4:12, IMW may only be initiated "in extraordinary circumstances and/or only after less restrictive alternatives have been exhausted (e.g., structured intervention plans, voluntary withdrawal)."

46.    The standard governing IMW procedure is stated in Section III.B:

The COC may initiate an involuntary medical withdrawal when a student cannot be adequately helped by the University's available resources or who refuses to accept the healthcare provider recommended treatment, and whose behavior involves one or more the following: (i) Engaging in behavior that poses a direct threat to his/her health and safety or that of others;[3] (ii) Repeatedly engaging in behavior that renders the student unable to participate to function appropriately and independently in a University setting; or (iii) Significantly disrupting others in the student's residency community, or the ability of others to participate in the educational programs or employment opportunities offered by the University.

47.    Under Section IV.A., the Community of Concern Team ("COC") is the "centralized point of contact for persons who develop a concern about the welfare or behavior of a student."  Under Section IV.B., before "initiating an involuntary medical withdrawal, [COC] takes appropriate intervention actions in accordance with the policies and procedures outlined in Administrative Regulation 4:11, Community of Concern Team."  Under UKAR 4:11, "community of concern" reports are addressed to the COC Director who reports to the Vice President for Student Success in the Office of the Dean of Students.

48.    Under Section IV.F, all IMWs are to be reviewed by a committee consisting of (i) the Chair of the COC; (ii) a member of the Counseling Center staff; (iii) a member of the University Health Services ("UHS") staff; (iv) a member of the Disability Resource Center ("DRC") staff; and (v) the Academic Ombud.

---

[3]    Under this Section, a "direct threat" exists "when a student engages, or threatens to engage, in behavior that poses a significant risk to the health or safety of the student or others."  A "significant risk" exists when there is a high probability of substantial harm and not just a slightly increased, speculative, or remote risk.

49.     Under Section IV.H. of UKAR 4:12:

> Any student who is placed on involuntary medical withdrawal will receive a "W" in each course for the semester during which the involuntary medical withdrawal is imposed.  Additionally, students will be refunded all tuition and fees for the semester during which they are placed on an involuntary medical withdrawal.  For students living in a building operated by University Housing and for students who have a University dining plan, the student's housing contract and/or dining plan will be prorated based on the date of the involuntary medical withdrawal.

In other words, because the IMW procedure is by definition involuntary, an IMW doesn't result in a student's permanent removal from the University or their academic coursework.  IMW status is temporary, and Section V supplies the procedure for academic reinstatement.

50.     Thereafter, Plaintiff objected to the IMW to ADA Coordinator Heather Roop as a violation of his rights under the ADA.  On October 31, 2024, Roop confirmed the same with Plaintiff, stating:

> [T]he Office of Equal Opportunity ("Equal Opportunity") has learned that you may have experienced behavior that could violate the University's Policy on Discrimination and Harassment (Administrative Regulation 6:1). I would like to meet with you to discuss this matter in more detail, as well as any concerns you may have and to provide you with information regarding your rights under the University's policies. I would also like to provide you with resources to address any concerns resulting from this incident.

51.     On November 8, 2024, UK prepared a packet of materials for Plaintiff's IMW appeal.

52.     On November 13, 2024, Plaintiff formally appealed.

53.     Dr. Reynolds upheld the IMW on December 3, 2024.

54.     On December 26, 2024, the Office of Community Concern confirmed that UK's justifications for placing Plaintiff on an IMW are patently false:

Please provide your professional judgment to respond to the following questions regarding the student named above. Please include comments where indicated.

Comments on student's current functioning: Sachin has been actively engaged, cooperative, and participating in each session. The patient has not displayed any negative behaviors. He has been able to deny any suicidal or homicidal ideations, intentions, or plan(s).

Additional comments (optional): At this time, it does not appear that Sachin is a threat to himself or others.

If you wish to expand on your responses to the questions above and/or to record any other comments or observations you may wish to make regarding the student and his/her ability to function safely, stably, and successfully as a student, please use additional pages or attach additional documentation.

**2025**

55.    Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

56.    On January 13, 2025, Plaintiff requested a rehearing of the IMW to the University Appeals Board ("UAB"), objecting to the IMW process, in part on First Amendment and Procedural Due Process grounds.

57.     On or about January 16, 2025, UK's Assistant General Counsel emailed
Plaintiff's then counsel, threatening Plaintiff's academic future if he went forward with
an appeal of the IMW:

> Evan & Kennedy – As a quick follow-up in preparation for your call, please
> remind Mr. Sundar that if we do proceed to the UAB, that entire proceeding
> becomes a part of his educational record which in some cases, other
> institutions and programs will request authorizations (from applicants) to
> obtain prior educational records, and in that case, all the documents on
> record for the UAB hearing would have to be produced. Again, we would not
> without authorization, authorization that the other institution requires for
> admission.

58.     On February 21, 2025, UK's Assistant General Counsel followed up as
follows:

> Sachin once again is reaching out to UK faculty and making demands he has
> zero standing to make. He contacted a faculty advisor and told her that he
> wanted two students removed from a student group that he founded. Not
> sure his issue with these students, but the request is inappropriate and lacks
> any basis.  As an aside, I am out of town at a conference, but I hope to find
> time to read your demand this weekend. Of note, we will not agree to any
> financial compensation; he's taken enough from the University in terms of
> funding, without much, if any, return in terms of research, so if that is non-
> negotiable for Sachin, we might as well move forward with scheduling a
> hearing.

59.     For good measure, Assistant General Counsel falsely accused Plaintiff of
"harassing" a fellow student:

> Apologies for the second email, but I want to add an additional concern I
> just received. "Madison Edwards reached out to Dr. Lineberry today and
> said Sachin contacted her (Maddie) via four text messages and a phone call
> yesterday alone, and that has been a recurring pattern." Maddie indicated
> she feels harassed. Please confirm when you have consulted with your
> client regarding this concerning behavior.

60.     On April 8, 2025, an alleged anonymous student reported Plaintiff for
"incidents" occurring on April 2 and 3, 2025, when Plaintiff confronted two of his

classmates about plagiarizing his work in a student group chat about plagiarizing his work, one of whom is the student he supposedly "harassed."

61.    At the direct instruction of officials in the UK College of Medicine, the anonymous student removed Plaintiff from the group chat on April 3, 2025, because Plaintiff wrote a PSA on Reddit about the disability discrimination directed at him before he was placed on an IMW:



62. Plaintiff also wrote as follows about the plagiarism of his work:

All I wanted to do was help others- through drug development and community service- and I was on track to do so, having already filed a provisional patent on a technology that could lead to a drug for a condition that affects 14% of Americans and kills 1.3 million people per year. I had already been accepted into an Eli Lily sponsored Commercialization Program for the drug idea. Unfortunately, I lost all of it because of the greed and corruption of the ALL POWERFUL and UNCHECKED FACULTY, which will only come back to hurt those suffering from disease.

I've stayed silent for months, hoping for answers. I was told that I can't talk to anyone on campus about this including students. So I have essentially been cut off from all forms of support.  I'm still waiting. But today, I saw that UK published a poster based on my work-without my name on it. I also recently saw that my "scholarship" was reverted to a $130k student loan since I didn't graduate and that my monthly payments of $2400/month start in October. I have a baby on the way and because UK derailed my career we only make $3,000/month and this payment would put us on the street.

I decided I can't stay quiet anymore. Something needs to be said about the corruption within the University and the danger to students.

I have documentation for all of this and so much more.

**This is a warning to students: If you're struggling, be careful who you trust. UK doesn't help; they remove you and mess up your life.**

**Whether it's medical providers or faculty, the student's best interest takes a back seat, while individuals' personal motives and liability drive their actions.**

**Please let me know if you have any advice. I need help.**

63. UK circulated the following to every student in the COM the following day:

Our goal is for every student who matriculates into the College of Medicine to successfully graduate, and we are committed to supporting you throughout your journey. We are aware of a Reddit post by a former student sharing their perspective on their experiences at UK. While we respect the right to share personal viewpoints, this portrayal does not fully reflect the comprehensive support and resources available to students.

64. On April 7, 2025, Plaintiff filed a discrimination complaint against UK with the Office for Civil Rights Discrimination.

65. On April 8, 2025, Plaintiff formally withdrew from all academic programs at the University of Kentucky under protest lest UK follow through on its threats to damage his academic future if he proceeded with an appeal.

66.    On April 15, 2025, UK informed Plaintiff that his appeal would be heard with or without his participation on April 25, 2025.

67.    On April 21, 2025, UK submitted a "supplemental" packet of materials for the UAB hearing, having nothing to do with the IMW or Plaintiff's academic performance, and everything to do with Plaintiff's online speech objecting to UK's tolerance for disability discrimination *after* being placed on IMW.

68.    Plaintiff filed EEOC Charge No. 474-2025-1027 against UK on April 25, 2025, alleging discrimination based on disability, national origin, race, and retaliation, which is incorporated by reference into the instant Complaint as if fully rewritten. [**Exhibit 2**].

69.    Plaintiff also filed EEOC Charge No. 474-2025-1028 against BAM on April 25, 2025, alleging discrimination based on disability, national origin, race, and retaliation because, for all practical purposes, there is no daylight between UK and BAM. UK and BAM shared control over the terms and conditions of Plaintiff's employment; BAM's offices were set up on UK's campus; Dr. Hilt a principal owner and member of BAM; BAM contributed to Plaintiff's salary; and both entities exerted shared control over key aspects of Plaintiff's employment, including without limitation, his hours, the location of his work, the scope and nature of his work, his compensation, daily supervision of his work, and indeed whether he would be employed at all.  The EEOC Charge against BAM is incorporated into the instant Complaint as if fully rewritten as [**Exhibit 3**].

## CAUSES OF ACTION

### COUNT I
#### VIOLATION OF THE 14TH AMENDMENT |
#### DENIAL OF EQUAL PROTECTION

70.    Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

71.    42 U.S.C. §1983 creates a private cause of action for violations of Constitutional rights perpetrated by any person acting under color of State law.

72.    Under the Equal Protection Clause of the Fourteenth Amendment, "no state shall ... deny to any person within its jurisdiction the equal protection of the laws."

73.    Plaintiff is a member of a "suspect class" within the meaning of the Equal Protection Clause by virtue of being a disabled person.

74.    At all times relevant to this Complaint, Plaintiff had a clearly established property right and interest in continued employment, academic enrollment, and his scholarship; and Plaintiff states a plausible claim that a constitutional violation occurred.

75.    At all times relevant to this Complaint, the Individual Defendants were "state actors" acting under color of state law, when they committed the acts and omissions described in this Complaint because their access to, and ability to exercise authority over Plaintiff's education and employment was possessed by virtue of state law, and made possible only because they are clothed with the authority of state law.

76.    As discussed in this Complaint, the Individual Defendants treated Plaintiff disparately as compared to similarly situated students and student-employees and took adverse actions against him because of his disabilities, including, without limitation, by refusing to afford him meaningful accommodations of his well-documented disabilities,

and taking adverse actions against him in the form of the IMW and subsequent UAB appeal for misconduct because he self-reported his disabilities, requested accommodations, and exercised his right to use accommodations granted to him.

77.    As discussed in this Complaint, Defendants took adverse action against Plaintiff not because of his academic or work performance, but due to alleged "disciplinary" concerns, ***and*** the content, form, and context of his protected speech criticizing UK and its officials for discrimination against disabled students.

78.    The Individual Defendants' disparate treatment of Plaintiff because of his disabilities burdened his fundamental rights to be free of discrimination based on disability in his employment, continued enrollment at UK, and his scholarship.

79.    The Individual Defendants' disparate treatment of Plaintiff because of his disabilities has no rational basis and violates his right to Equal Protection under the Fourteenth Amendment.

80.    As described in this Complaint, and as a direct and proximate result of the Individual Defendants jointly and severally depriving Plaintiff of his property right and interest in continued employment, continued enrollment at UK, and his scholarship, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### COUNT II
### VIOLATION OF THE 14TH AMENDMENT |
### DEPRIVATION OF PROCEDURAL DUE PROCESS

81.    Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

82.     Under the Procedural Due Process Clause of the Fourteenth Amendment, a State may not deprive persons of "life, liberty, or property, without due process of law."

83.     Under Kentucky law, Plaintiff has the following "life, liberty, or property" interests protected by the Due Process Clause: (a) continued employment; (b) access to federal funding and a Scholarship; and (c) continued enrollment at UK upon matriculating at the university.

84.     As alleged in this Complaint, on October 25, 2025, Plaintiff failed to afford Plaintiff adequate procedural rights before depriving him of his property interests.

85.     As described in this Complaint, and as a direct and proximate result of the joint and several acts and omissions of the Individual Defendants, depriving Plaintiff of his procedural due process rights under the Fourteenth Amendment, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### COUNT III
### FIRST AMENDMENT RETALIATION

86.     Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

87.     As alleged in this Complaint, Plaintiff engaged in the following constitutionally protected speech and conduct:

> a. Speaking up for, and demanding access to his rights arising under federal law to be free of unlawful discrimination based on his disabilities;

b.  Speaking up for, and demanding reasonable accommodations for his disabilities;

c.  Speaking out against retaliation directed at him;

d.  Speaking publicly online about disability discrimination at the University of Kentucky.

88.    As alleged in this Complaint, the Individual Defendants took the following adverse actions against him because he engaged in the protected conduct discussed in this Complaint, such that it would deter a person of ordinary firmness from continuing to engage in the protected conduct identified in this Complaint:

a.  Depriving him of accommodations to which he is entitled under federal law;

b.  Imposing an involuntary medical withdrawal against him;

c.  Punishing him in the UAB proceedings for speaking out publicly about disability discrimination at UK, **after** he informed UK that he wished to end his academic association with UK; after he'd already been unjustly put under an IMW; by converting a hearing on the IMW to a disciplinary proceeding while Plaintiff wasn't enrolled in classes or on UK's campus; and by deliberately tarnishing his reputation among his colleagues and peers as a disabled person.

89.    The Individual Defendants took the adverse actions against Plaintiff identified in this Complaint, at least in part, because he engaged in the protected activity under the First Amendment.

90.     The Individual Defendants would not have taken the adverse actions against Plaintiff described in this Complaint without his engagement in the protected activity identified in the same, most obviously with the Reddit post because Plaintiff had already informed UK that he didn't wish to proceed with the UAB proceeding, and because UK and the Individual Defendants specifically relied on his protected speech as a basis for disciplining him only days before a scheduled hearing.

91.     As described in this Complaint, and as a direct and proximate result of the Individual Defendants jointly and severally retaliating against Plaintiff because he engaged in speech and conduct protected by the First Amendment, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

## Count VI
## Monell Liability | University of Kentucky

92.     Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

93.     The unconstitutional acts and omissions of the Individual Defendants were made and taken at the highest levels of the university and were the decisions of policymakers at UK, such that the violation of Plaintiff's rights arising under the First and Fourteenth Amendments constituted the official but informal policy of the university, and/or a widespread, but unofficial policy of the university, and such that UK is liable in its own right under Section 1983.

94.     The informal or formal policies, customs, and procedures of UK leading to the unconstitutional acts and omissions committed by the Individual Defendants were the driving force behind the same.

### CAUSES OF ACTION ARISING UNDER THE REHABILITATION ACT

#### COUNT V
#### DISABILITY DISCRIMINATION |
#### UNIVERSITY OF KENTUCKY AND BLUEGRASS ADVANCED MATERIALS, LLC

95.     Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

96.     At all times relevant to this Complaint, Plaintiff has been a "handicapped" or "disabled" person under Section 504 by virtue of suffering from PTSD, anxiety, severe chronic depression, generalized anxiety, and suicidal ideation.

97.     As alleged in this Complaint, Plaintiff was otherwise qualified to participate as a student-employee at UK and with BAM at all times relevant to this Complaint, with or without an accommodation of his disabilities.

98.     As alleged in this Complaint, UK and BAM knew that Plaintiff suffered from the foregoing impairments because he disclosed them to several officials in various offices at the university.

99.     As alleged in this Complaint, UK and BAM excluded Plaintiff from participating as a student employee, denied him the benefits of the same, and otherwise subjected him to discrimination solely by reason of his handicap and disabilities.

100.    At all times Relevant to this Complaint, UK and BAM received federal financial assistance.

101.   As described in this Complaint, and as a direct and proximate result of UK and BAM jointly and severally discriminating against Plaintiff because of his disabilities, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

## COUNT VI
### FAILURE TO ACCOMMODATE |
### UNIVERSITY OF KENTUCKY AND BLUEGRASS ADVANCED MATERIALS, LLC

102.   Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

103.   As described in this Complaint, Plaintiff requested accommodations for his disabilities both as a student and as an employee.

104.   As described in this Complaint, the accommodations requested by Plaintiff were feasible and reasonable, and wouldn't impose any burden or hardship on UK or BAM.

105.   Despite requesting accommodations for his disabilities, UK and BAM refused to engage in the mandatory interactive process to determine whether Plaintiff was entitled to an accommodation.

106.   Indeed, instead of accommodating Plaintiff's disabilities, Defendants deliberately took adverse actions against him to impede his participation in, or benefit from, his enrollment as a graduate student and employee.

107.   As described in this Complaint, and as a direct and proximate result of UK and BAM jointly and severally failing to accommodate Plaintiff's disabilities, Plaintiff

has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### COUNT VII
### RETALIATION |
### UNIVERSITY OF KENTUCKY AND BLUEGRASS ADVANCED MATERIALS, LLC

108.    Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully rewritten.

109.    As alleged in this Complaint, Plaintiff engaged in protected activity under federal law.

110.    As alleged in this Complaint, Plaintiff also internally objected to unlawful treatment by UK and BAM.

111.    As alleged in this Complaint, Plaintiff further objected publicly to unlawful treatment by UK and BAM.

112.    As alleged in this Complaint, UK and BAM knew that Plaintiff engaged in the protected activity discussed in the same because there was extensive back and forth about the process between Plaintiff, UK, and Dr. Hilt.

113.    As alleged in this Complaint, UK and BAM took materially adverse actions against Plaintiff because he engaged in protected activity, such that protected activity was at least a motivating factor in their decisions and therefore retaliated against him in violation of Section 504.

114.    As described in this Complaint, and as a direct and proximate result of UK and BAM jointly and severally retaliating against Plaintiff for engaging in activity

28

protected by Section 504 of the Rehabilitation Act, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Sachin Sundar prays for judgment against Defendants the University of Kentucky, Bluegrass Advanced Materials, LLC, Trisha Clement individually and in her capacity as a public official acting under color of state law, and Julie F. Costich, Ph.D. personally and in her capacity as a public official acting under color of state law, and for the following relief: (a) Compensatory damages; (b) Damages for emotional distress and psychological injuries; (c) Statutory damages; (d) Equitable relief; (e) Pre- and post-judgment interest on compensatory damages, emotional distress damages, statutory damages, and equitable relief; (f) Injunctive relief; (g) An award of her attorney's fees and costs; (h) An award of punitive damages; and (i) Such other relief the Court deems appropriate in excess of its jurisdictional threshold.

**DATED: October 27, 2025.**

Respectfully submitted,

**/s/Justin M. Whittaker**
Justin M. Whittaker, Esq. (92364)
WHITTAKER LAW, LLC
2055 Reading Road, Suite 260
Cincinnati, Ohio 45202
(513) 457-5545
(513) 436-0698 Fax
Justin@WhittakerLawFirm.com

**Counsel for**
**Plaintiff Sachin Sundar**

## **<u>JURY DEMAND</u>**

Plaintiff demands a jury trial on all issues so triable.

*<u>/s/Justin M. Whittaker</u>*
Justin M. Whittaker, Esq. (92364)



MD/PhD Program

*Training the next generation of Physician – Scientists*

**Sidney W. Whiteheart, PhD,
Director, MD/PhD Program**

**Richard D. King MD, PhD,
Co-Director, MD/PhD
Program**

**Chris Simmons, MD, PhD
Co-Director, MD/PhD
Program**

University of Kentucky
741 South Limestone Street
B347 Biomedical
Biosciences Research
Bldg.
Lexington, Kentucky 40536
.
Phone: (859) 323-2274
www.mdphd.med.uky.edu/

April 18, 2022

1 Emerson Place, #70
Boston, Massachusetts, 02114

Dear Sachin Sundar,

On behalf of the MD/PhD Admission/Advisory Committee, I am delighted to offer you a position in the 2022 – 2023 entering class of the MD/PhD Program at the University Of Kentucky College Of Medicine.

As a student in good academic standing, you will receive a MD/PhD program scholarship that includes the cost of your medical school tuition and student fees. In addition, the scholarship provides a $25,000 stipend per year for the four medical school years. Funding during graduate school will be through the usual mechanisms established for doctoral students within your selected area of study. The current stipend for graduate students in the Interdisciplinary Biomedical Sciences graduate program in the College of Medicine is $25,000 per year. Tuition related to your doctoral program is also guaranteed, conditional upon approval of your coursework by your doctoral program/advisory committee. (Please note the additional terms of this offer described on page 2 of this letter).

We are very excited about having you in the MD/PhD program and hope that you accept this offer. We would appreciate knowing your decision by April 30, 2022. To reserve your position in the program, please visit the University of Kentucky College of Medicine Combined Medical Degree/PhD program Applicant Gateway and accept the offer.

Again, we congratulate you on your acceptance and look forward to you being a part of our program. We have every confidence that you will be an outstanding MD/PhD candidate and an asset to our program. If you have any questions or wish to talk more about the program, please call (859) 323-2274 or email Therese Stearns at therese.stearns@uky.edu.

Best regards,

Sidney W. Whiteheart, PhD, FAHA
Professor, Molecular and Cellular Biochemistry
Director of the MD/PhD Training Program

<span style="color:red">**EXHIBIT 1**</span>

**Additional Terms**

Your offer of admission and your MD/PhD scholarship is conditional pending completion of a criminal background check with results deemed acceptable by the College of Medicine. Should you have questions about our policy, please refer to the Admissions office at (859) 323-6161.

The background check will be administered through AMCAS soon after the conditional acceptance is offered. Pending an acceptable criminal background check report, a final offer of admission will be forwarded to you. If, during the intervening time between your criminal background check and your matriculation, a situation occurs that alters your criminal status, you must advise the Admissions office immediately.

The UKY MD/PhD Program is a member of the UKY Graduate School: Graduate Biomedical Sciences Office, and the University of Kentucky School of Medicine, and therefore must abide by all UKY policies that pertain to each group, respectively.

Acceptance in the MD/PhD program is contingent upon the continuation of your strong academic and personal performance subsequent to your application, and that led to your selection.
Should your academic performance fall below an acceptable level, and/or your criminal status change, or should you not return the required documentation -- including a final official transcript(s) with all prerequisites -- to the Admissions Office by June 1, 2022 your acceptance will be subject to reconsideration.

In addition, you are required to submit scholastic progress reports, if applicable, after each semester.


**Programmatic Contingencies**

Your MD/PhD scholarship is contingent upon you remaining in academic good standing and meeting program requirements.  For the first two years of medical school, your scholarship will be disbursed as a loan that will be canceled, provided you:

      **1)** Successfully complete the first two years of the medical curriculum and USMLE Step 1 Exam in good standing;

      **2)** Attain and maintain the status of a doctoral candidate in good standing (this includes completing the required graduate curriculum and qualifying exams for your graduate department);

      **3)** Required to submit a NIH F-fellowship grant proposal during your graduate years;

      **4)** Complete your dissertation and have it approved by your mentor, thesis committee, and the Graduate School.


Note that by completing 2-4 above, you will have completed the PhD part of your degree.  Your loan will be canceled in full at the time you enter your third year of medical school, if you have met the above requirements.


Once you have completed your PhD training and returned to the College of Medicine, you will receive the funds for each year of your third and fourth years of medical school as a scholarship, with no reference to a loan and/or cancellation of terms.



*Training the next generation of Physician – Scientists*

University of Kentucky College of Medicine Combined Medical Degree/PhD program invites you to take the next step with your application. Please visit your University of Kentucky College of Medicine Combined Medical Degree / PhD program Applicant Gateway to complete your next activity.

Please use your AAMC username and password to sign into the system. These are the same credentials you used to access your AMCAS application.

After you sign into your AAMC account, it will direct you to the Applicant Gateway.

If you have questions please do not hesitate to contact me.

Therese

## Therese Stearns
MD/PhD Program Administrative Director
University of Kentucky
741 S. Limestone Street, BBSRB Room 354
Lexington, KY 40506
859-323-2274

therese.stearns@uky.edu